STATE OF MINNESOTA

IN SUPREME COURT

A24-1567

Original Jurisdiction                                           Per Curiam

In re Petition for Disciplinary Action
against Kassius O. Benson, a Minnesota                    Filed: July 29, 2026
Attorney, Registration No. 0266632.                  Office of Appellate Courts

_____

Susan M. Humiston, Director, Timothy M. Burke, Senior Assistant Director, Office of
Lawyers Professional Responsibility, Saint Paul, Minnesota, for petitioner.

Kassius O. Benson, Minneapolis, Minnesota, pro se; and

Melvin Welch, Welch Law Firm, LLC, Minneapolis, Minnesota, for respondent.

_____

S Y L L A B U S

Disbarment is the appropriate discipline for an attorney who was convicted of

felony tax evasion arising out of the practice of law and who intentionally

misappropriated client funds, where multiple factors aggravated his misconduct.

Disbarred.

O P I N I O N

PER CURIAM.

The Director of the Office of Lawyers Professional Responsibility brought a

petition for disciplinary action alleging that respondent Kassius O. Benson violated the

1

Minnesota Rules of Professional Conduct by (1) committing the federal felony offense of failing to account for and pay over employment taxes, in violation of 26 U.S.C. § 7202, for which he was convicted and sentenced in May 2024, and (2) misappropriating funds from a private client's family in a criminal case. A referee concluded that Benson committed the misconduct alleged in the petition and that the misappropriation was intentional, and found several aggravating factors and one mitigating factor. Benson does not meaningfully dispute the referee's factual findings with respect to the alleged rule violations. Thus, the only question before us is the appropriate discipline to impose. Because felony tax misconduct and intentional misappropriation are among the most serious types of attorney misconduct and because there are aggravating factors, we conclude the appropriate discipline is disbarment.

## FACTS

Benson was admitted to practice law in Minnesota in 1996. After serving as a public defender for several years, Benson opened a private criminal defense firm which he operated until he became Hennepin County's chief public defender in January 2021.

Benson has a limited disciplinary history of prior misconduct arising out of his private law practice. In July 2015, the Director issued Benson an admonition after finding that he had failed to adequately communicate with a client, failed to deposit an advance fee paid by the client into a trust account, and improperly described his fee as "earned upon receipt" in the fee agreement. *See* Minn. R. Prof. Conduct 1.4 (general client communication), 1.5(b) (communication with client regarding fees), 1.15(c)(5) (depositing advance fees received into trust). In November 2019, the Director issued

2

Benson a second admonition for failing to deposit another client's flat fee into a trust account in the absence of an appropriate written fee agreement, failing to clearly communicate the basis of his fees to the client, and ignoring repeated requests to provide the client with a copy of his file following termination of the representation. *See* Minn. R. Prof. Conduct 1.15(c)(4), 1.16(d).

The Director's current petition alleges two separate counts: one based on Benson's tax conviction and the other for misappropriating funds belonging to a private client's family. We briefly describe the facts relevant to each count before reviewing the disciplinary proceedings below.

### *Felony Tax Misconduct*

Benson started a private criminal defense firm, Kassius Benson Law, in 2002 and was the firm's managing partner and sole shareholder. Although Benson initially operated as a solo practitioner, he eventually hired associates to enable the firm to take on more clients. Beginning in 2013, Benson failed to pay federal taxes that he withheld from these employees' salaries. In 21 of 24 quarters in tax years 2013 and 2015–2019, Benson either did not pay the full amount the firm owed to the IRS or failed to file the firm's quarterly federal income tax returns entirely. Over these six years, Benson withheld, but did not pay to the government, a total of $159,270.28 in employment taxes. Benson also represented on his 2017–2019 personal tax returns that the firm had withheld and paid over taxes on his personal income, which he knew to be false. In total, Benson owed the IRS $213,591.81 in unpaid taxes. Instead of paying federal taxes, Benson used the money he withheld from employees' salaries to pay his own personal and business expenses.

3

Benson took office as Hennepin County's chief public defender on January 1, 2021. Sometime in 2022, Benson came under federal investigation for failure to pay to the government the employment taxes he withheld while in private practice. Benson resigned from the public defender's office in October 2022 after news of the investigation became public, citing potential "distractions" for the office. He was formally indicted on federal tax charges on February 9, 2023.

On December 4, 2023, Benson pled guilty to one count of failing to account for and pay over employment taxes in violation of 26 U.S.C. § 7202, a felony offense. In Benson's sentencing briefing, his attorneys asserted that his failure to pay employment taxes resulted from his inattention and financial mismanagement as the firm grew. Benson's briefing noted that he chose to do the firm's accounting himself using "low-cost" software rather than hire an employee to administer payroll. Yet, according to screenshots submitted by the Director, the software clearly (1) showed that the firm had not filed required quarterly returns, (2) displayed the amounts the firm owed to the IRS, and (3) provided options to populate and e-file required tax forms and make required payments. Benson's briefing also advanced the prospect of Benson's inevitable professional discipline as a reason for leniency in his criminal case. Many of Benson's friends and former colleagues sent letters of support to the sentencing judge emphasizing Benson's positive contributions to the bar; his commitment to criminal defense, diversity, and mentorship; and the personal impact of the charges on Benson. The court entered a judgment of conviction and sentenced Benson to three years' probation, a significant downward departure from the United States Sentencing Guidelines range of an executed

4

sentence of 8 to 18 months in prison. The court also ordered Benson to pay $213,591.81 in restitution.

### *Intentional Misappropriation of Client Funds*

On December 30, 2020, approximately three years before he pled guilty to the federal tax offense, T.A. and M.A. retained Benson to defend their son, A.A., against federal felony charges. Although A.A. was not a minor, his parents served as his legal guardians because of his significant disabilities. A.A.'s parents lived on a modest income and supported five other children. A.A. was initially represented by a public defender, but T.A. and M.A. became concerned with the quality of his representation. Because the maximum sentence for A.A.'s charges was over 50 years in prison, his parents decided to hire Benson instead. They took out a second mortgage on their home to pay his $40,000 flat fee.

Two days after A.A.'s parents hired Benson, Benson became Hennepin County's chief public defender. While in that position, Benson continued to represent A.A. and several other private clients.[1]

On October 13, 2021, shortly before A.A.'s scheduled trial date, Benson emailed T.A. asking for an additional $12,500 in costs related to the representation. Benson's fee agreement described his flat fee as "preliminary" and authorized him to charge additional fees if a matter became more complex. Benson explicitly told T.A. that $7,500 of the additional money would cover "dispositional / mitigation specialists" and the other

---

[1]     The Director does not allege Benson acted inappropriately by continuing to represent these private clients after becoming Hennepin County's chief public defender.

$5,000 would cover "trial expenses." T.A. understood this to mean that Benson needed this money to get A.A. the best possible outcome at trial. T.A. and M.A. took out a bank loan—on top of the second mortgage—to come up with the additional $12,500 Benson requested, which caused the family considerable financial hardship.

T.A. transferred $12,500 to Benson's law firm's operating account in two payments, dated October 15 and 18. Rather than deposit these funds into a trust account, Benson used the money for various personal and business expenses. On October 19, one day after T.A.'s second payment, only $22.38 remained in the firm's operating account. By October 22, the account balance was negative. According to bank records for the firm's operating account, Benson made several ATM withdrawals, each for at least $300, spent over $500 at various retail stores and over $150 at a liquor store, and transferred $3,824 to a personal bank account using an online payment platform. He also used the firm's operating account to pay $5,250 in rent on his home and $523 to a self-storage business. Nearly all of these transactions occurred on October 15 and 18, the same days T.A. made the payments.

A.A.'s case never went to trial. On November 12, 2021, A.A. entered into a plea agreement with the government and was later sentenced to 25 years in prison. Benson did not use any of the $12,500 towards experts, specialists, or trial expenses, and he did not return any money to T.A. once the representation ended.

After learning of Benson's tax charges through the news, T.A. filed a complaint with the Director alleging that Benson never returned her money and had instead used it to cover his own legal expenses in connection with the investigation. The Director's

6

office notified Benson of the complaint through counsel on April 27, 2023. Benson made no effort to contact T.A. until August 2023—nearly two years after A.A. pled guilty—when he returned $6,250 to her via money order. Benson later referenced the money in an email he sent T.A. on September 18, 2023, stating: "I hope to get you the remainder of the refund by September 30. I will notify you immediately if anything changes. This is a definite priority." On November 7, 2023, T.A.—having received no additional money or follow-up communication from Benson—replied expressing frustration that Benson had not "follow[ed] through with the plan as stated" and asking him to contact her "as soon as possible to confirm the delay and confirm how soon [the money] will be sent." Benson did not respond or contact T.A. for over eight months, until after his criminal charges were adjudicated.

About a month after his sentencing, in a June 17, 2024 email, Benson proposed repaying the remaining $6,250 to T.A. in three installments, with the final payment due August 1. Benson attributed his delay in repaying T.A. as "due to ongoing matters of which you are aware." Benson apologized for the delay and indicated that he was "now in a better position to take care of this outstanding debt." T.A. received the remainder of her money, plus roughly $1,400 in interest, on either August 7 or 8, 2024.

### Disciplinary Proceedings

Shortly after Benson repaid T.A., the Director initiated this disciplinary action. A referee held an evidentiary hearing on January 27, 2025, at which Benson and T.A. testified. T.A.'s testimony primarily set out the circumstances of the misappropriation described above. T.A. also testified that coming up with the additional $12,500 Benson

7

requested created significant hardship for her family; T.A. was unable to work full-time while caring for her children and had to take out a bank loan, on top of the second mortgage for Benson's initial fee, to pay him. T.A. stated that she was shocked, disappointed, and "heartbroken" by the ordeal.

At the hearing, Benson did not contest the factual allegations in the Director's petition but at times disagreed with the Director's characterization of these facts. On cross-examination, Benson admitted that he should have deposited T.A.'s $12,500 into a trust account but failed to do so, and that he never hired the experts nor incurred the expenses he claimed the funds would cover. Benson also admitted that it did not occur to him to repay the money until after he received the Director's notice of T.A.'s complaint; he testified that, in fact, the complaint "surprised" him. While acknowledging that it was "not her responsibility," Benson remarked that T.A. could have asked him to return the money during conversations they had around the time of A.A.'s sentencing, but she did not. And although Benson initially testified that the $7,500 he claimed would pay for a mitigation specialist "should have been put into a trust account," he also seemed to suggest that he earned—or at least was not required to deposit into trust—$5,000 of this money that he earmarked for "trial expenses." Prompted by the referee, Benson testified that it was "debatable" whether the Rules required him to deposit that $5,000 into a trust account because "there was more additional things to do when we were preparing for trial." Benson insisted, however, that he was not "sitting here trying to debate" that, and that he never intended to keep T.A.'s money. Rather, he suggested that his failure to

8

timely repay T.A. was due in part to his own financial difficulties caused by his investigation and eventual indictment.

Although Benson attempted to minimize or deflect blame for his misconduct, he also repeatedly acknowledged wrongdoing. For example, Benson testified that the money "should have been available to give back to [T.A.]," and explained, "I was wrong for that .… [I]t's unfortunate that she has a different view of myself and also lawyers in general. I regret that." Benson also accepted responsibility for the tax misconduct that led to his felony conviction. He testified: "As far as remorse goes, I definitely have remorse and feel the consequences. I've had consequences in the felony case. I will have consequences obviously with licensing. However that turns out." But while Benson briefly apologized to T.A., most of his testimony as to why less severe discipline was warranted focused not on remorse for the effect his actions had on others, but on how his career, service to clients, and dedication to training early-career public defenders should mitigate his misconduct.

As to the A.A. matter, the referee concluded that Benson intentionally misappropriated client funds in violation of Minn. R. Prof. Conduct 1.15(a) and 8.4(c) by receiving client money for a stated purpose, failing to deposit that money into a trust account, and instead using the money for business and personal purposes.[2] The referee

_____

[2]     Rule 1.15(a) provides, as a general rule, that "[a]ll funds of clients or third persons held by a lawyer or law firm in connection with a representation shall be deposited in one or more identifiable trust accounts." Rule 8.4(c) states that "it is professional misconduct for a lawyer to … engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

9

further concluded Benson's failure to return these funds at the end of representation and again when requested to do so by T.A. violated Minn. R. Prof. Conduct 1.15(c)(4) and 1.16(d).[3] The referee also noted that Benson did not return T.A.'s money until after he had received notice of the Director's disciplinary investigation.

Addressing Benson's felony tax conviction, the referee relied on Rule 19(a), Rules on Lawyers Professional Responsibility (RLPR), to conclude that Benson's misconduct violated Minn. R. Prof. Conduct 8.4(b) and (d).[4] *See* Rule 19(a), RLPR (stating that a lawyer's criminal conviction in any American jurisdiction is conclusive evidence that the lawyer committed the misconduct for which he was convicted). The referee found four aggravating factors: that Benson had (1) a selfish motive in converting T.A.'s money and employees' taxes he had withheld to personal use, (2) substantial experience in practicing law, (3) a history of prior discipline for similar misconduct, and (4) a lack of remorse. Considering Benson's remorse, the referee found that Benson's limited expressions of regret for the harm he caused T.A. and her family were "insincere, contrived, and not credible." The referee further found that Benson failed to demonstrate genuine remorse

---

[3]  Rule 1.15(c)(4) requires a lawyer to "promptly pay or deliver to the client or third person as requested the funds, securities, or other properties in the possession of the lawyer which the client or third person is entitled to receive." Similarly, Rule 1.16(d) requires that, "[u]pon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as … refunding any advance payment of fees or expenses that has not been earned or incurred."

[4]  These rules provide: "It is professional misconduct for a lawyer to … commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects" or "engage in conduct that is prejudicial to the administration of justice." Minn. R. Prof. Conduct 8.4(b), (d).

for the tax misconduct that led to his felony conviction, instead showing "a remarkable lack of insight into understanding the substantial harm that he has caused." The referee considered Benson's professional contributions—including his work with the public defense bar and pro bono service—to be a mitigating factor, but ultimately concluded that this "positive is overshadowed by his substantial ethical failures that occurred over many years and devast[at]ed many people."

The Director argued—and the referee agreed—that Benson should be disbarred. The Director now requests that we impose disbarment. For his part, Benson does not dispute the rule violations, but challenges several of the referee's findings and conclusions that bear on the appropriate discipline. Thus, the only issue before us is what discipline to impose. *See In re Lieber*, 939 N.W.2d 284, 291 (Minn. 2020) (noting that we consider challenges to a "referee's findings and conclusions about certain aggravating and mitigating factors" as "part of our analysis on the appropriate discipline").

## ANALYSIS

Because Benson timely ordered a transcript of the evidentiary hearing, "none of the [referee's] findings of fact or conclusions shall be conclusive." Rule 14(e), RLPR. We nonetheless give "great deference" to the referee's findings and conclusions and will uphold them if "they have evidentiary support and are not clearly erroneous." *In re Kaminsky*, 999 N.W.2d 866, 873 (Minn. 2024) (citation omitted) (internal quotation marks omitted). In deciding what discipline to impose, we place "great weight on the referee's recommended discipline" but "retain ultimate responsibility for determining the appropriate sanction." *In re Nwaneri*, 896 N.W.2d 518, 525 (Minn. 2017). To reach that

11

determination, we consider four factors: (1) the nature of the attorney's misconduct, (2) the cumulative weight of the disciplinary violations, (3) the harm caused to the public, and (4) the harm caused to the legal profession. *In re Matson*, 889 N.W.2d 17, 23 (Minn. 2017). We next consider any aggravating or mitigating factors. *In re Hansen*, 868 N.W.2d 55, 59 (Minn. 2015). Finally, we look to similar cases to ensure consistency in discipline for like misconduct, but proper discipline is ultimately determined "based on the unique facts and circumstances of each case." *Matson*, 889 N.W.2d at 25 (citation omitted) (internal quotation marks omitted). When considering the appropriate sanction, we bear in mind that the purpose of discipline is not to punish the attorney but rather "to protect the public, to protect the judicial system, and to deter future misconduct by the disciplined attorney as well as by other attorneys." *In re Rebeau*, 787 N.W.2d 168, 173 (Minn. 2010).

## A.

We first consider the four factors bearing on the appropriate discipline.

## 1.

We begin with the nature of each type of misconduct. Here, Benson intentionally misappropriated client funds in violation of Minn. R. Prof. Conduct 1.15 and committed felony tax offenses in violation of Minn. R. Prof. Conduct 8.4.[5] Intentional misappropriation and misconduct committed in the practice of law that results in a felony tax conviction are among the most serious types of attorney misconduct. *See, e.g.*, *In re*

---

[5] Benson does not dispute the referee's conclusion that he committed this misconduct.

*Rooney*, 709 N.W.2d 263, 268 (Minn. 2006) (characterizing intentional misappropriation as "serious misconduct that generally warrants disbarment"); *In re Perez*, 688 N.W.2d 562, 567 (Minn. 2004) ("We view felony convictions as serious misconduct …."). The referee and the Director therefore recommend that we disbar Benson.

Indeed, "[m]isappropriation alone usually warrants disbarment absent clear and convincing evidence of substantial mitigating factors." *In re Padden*, 10 N.W.3d 291, 299 (Minn. 2024) (citation omitted) (internal quotation marks omitted). Rule 1.15 requires a lawyer to deposit fees received into a trust account and withdraw those fees only once earned. Minn. R. Prof. Conduct 1.15(c)(5). We have held that intentional misappropriation occurs when "funds belonging to a client are not deposited in a trust account and are used for any purpose other than that specified by the client." *In re Eskola*, 891 N.W.2d 294, 299 (Minn. 2017) (citation omitted) (internal quotation marks omitted). Benson intentionally misappropriated T.A.'s funds by explicitly requesting that T.A. pay $12,500, in addition to his flat fee, for the stated purpose of covering anticipated trial expenses, which Benson then kept for himself. Not only did Benson direct T.A. to transfer these funds to the firm's operating account and fail to hold them in trust, but he also spent virtually all of this money on cash withdrawals, rent, purchases at retail stores, and payments to himself on the very same days T.A. sent the payments. Moreover, Benson never incurred the anticipated trial-related expenses, yet he failed to fully reimburse T.A. until after T.A. filed a complaint with the Director's office, over two-and-a-half years later. *See* Minn. R. Prof. Conduct 1.15(c)(4), 1.16(d) (requiring attorneys to "promptly" pay funds due to a client and, upon termination of the representation,

13

"refund[] advance payment of fees or expenses that has not been earned"). As the Director points out, all this occurred while Benson was serving in a position of public trust as Hennepin County's chief public defender. This misconduct, alone, is serious.

But Benson was also convicted of a felony for failing to account for and pay over employment taxes arising out of his law practice. The presumptive discipline for this misconduct, as with intentional misappropriation, is also disbarment. *In re McNeilly*, 18 N.W.3d 774, 780 (Minn. 2025) ("The presumptive discipline for a felony conviction is disbarment, particularly where the criminal conduct occurs (as in this case) within the practice of law." (citation omitted) (internal quotation marks omitted)). Over a period of six years, Benson knowingly failed to pay over more than $150,000 in withheld employment taxes and, on his personal income tax returns, falsely claimed that he had paid employment taxes on his own salary. In his sentencing briefing for his criminal trial, Benson's attorneys noted that he chose not to hire an employee to administer payroll for the firm but instead opted to do the firm's accounting himself to free up resources for client representation. Yet Benson's accounting software clearly indicated that the firm had not filed required federal tax forms. It also calculated and displayed the amount due for each quarter, provided options to populate and e-file these forms, and linked to an online payment platform for making the required payments. Benson knew of his obligation to pay taxes and had ample opportunity to do so; he instead chose to use the withheld tax money for personal and business purposes. This misconduct, which led to a felony conviction, arose out of and was directly related to Benson's legal practice. *See In re*

14

*Andrade*, 736 N.W.2d 603, 605 (Minn. 2007) (noting that a felony conviction is especially serious "where the criminal conduct occurs … within the practice of law").

As in *In re McNeilly*, where the lawyer committed intentional misappropriation resulting in a felony theft conviction, "the nature of [Benson's] misconduct weighs heavily in favor of a severe sanction." 18 N.W.3d at 780.

2.

Next, we consider the cumulative weight of Benson's disciplinary violations. Generally, we differentiate between "a brief lapse in judgment or a single, isolated incident and multiple instances of misconduct occurring over a substantial amount of time." *In re Pearson*, 888 N.W.2d 319, 322 (Minn. 2016) (citation omitted) (internal quotation marks omitted). Thus, the cumulative weight and severity of multiple violations may compel severe discipline "even when a single act standing alone would not have warranted such discipline." *In re Oberhauser*, 679 N.W.2d 153, 160 (Minn. 2004). Here, we agree with the referee that Benson's tax misconduct was not an isolated act. Rather, Benson failed to pay employment taxes owed to the federal government repeatedly over a substantial period of time—Benson underpaid or entirely failed to pay withheld taxes in nearly every quarter of tax years 2013 through 2019.

Benson's misappropriation—which occurred two years after the conduct for which he was convicted of the federal tax offense—fits this same pattern of financial misconduct. After securing funds from T.A., Benson repeatedly ignored or failed to timely respond to communications from her regarding the money and ultimately failed to fully reimburse her for more than two-and-a-half years after receiving payment. In both

15

instances of misconduct, Benson wrongfully kept and knowingly spent money that was not his. The cumulative weight of Benson's misconduct paints a troubling picture of an attorney who repeatedly placed his own financial wants and needs over his legal obligations and fiduciary duties to his client. This, too, warrants a severe sanction.

3.

Finally, we evaluate the harm the misconduct caused to the public and the legal profession. *Matson*, 889 N.W.2d at 24. Here, the referee found that Benson's tax misconduct caused substantial harm to the public and the Hennepin County Public Defender's Office. He also found that Benson's misappropriation caused serious financial and emotional difficulties for T.A. and her family.

Before us, Benson challenges only the referee's finding that his tax misconduct harmed the public defender's office, which we review for clear error. *See Kaminsky*, 999 N.W.2d at 873 (stating that we uphold a referee's factual findings when they have evidentiary support in the record and are not clearly erroneous). In making this determination, the referee stated that Benson's misconduct harmed the public defender's office, in part, because "[w]hen Respondent was indicted for this misconduct, he was the Chief Public Defender for Hennepin County." Benson is correct that this *specific* factual finding was clearly erroneous—Benson resigned as chief public defender in October 2022, but was not indicted until February 2023. But the referee's *overall* conclusion that Benson's misconduct and the resulting investigation, indictment, and conviction caused harm to his previous office was correct. In his sentencing briefing and before the referee, Benson admitted that his legal problems had (or threatened to have)

16

negative impacts on the work of the Hennepin County Public Defender's Office. Benson told his sentencing judge that he voluntarily resigned as the chief public defender after the Director's investigation "came out publicly" because "[h]is legal problems threatened to distract from the important work" of the office. Benson offered the referee the same explanation for his resignation. Equally important, the referee noted that the position of chief public defender is one of public trust. Thus, the referee could have readily concluded—based on the record as a whole—that the widely publicized investigation into the chief public defender for federal tax crimes harmed the public's perception of and trust in the office, even if the investigation did not directly interfere with Benson's work. Finally, although the referee did not specifically note it, Benson placed considerable weight on his efforts to improve training and diversity at the public defender's office when arguing for mitigation. Yet he fails to appreciate how his abrupt resignation could have jeopardized those efforts and impacted his colleagues' day-to-day work. For these reasons, we conclude that the referee's finding that Benson's tax misconduct harmed the public defender's office has ample evidentiary support in the record and therefore was not clearly erroneous. *See id.*

We also agree with the referee that Benson's tax misconduct caused considerable harm to the public. Put simply, Benson wrongfully kept over $200,000 of money owed to the government for himself. And, as the referee noted, Benson's felony tax misconduct also "breach[ed] the trust established between employer and employee, and call[ed] on governmental resources to enforce compliance with the law by those who are sworn to uphold it." *In re Moulton*, 721 N.W.2d 900, 905 (Minn. 2006) (citation omitted) (internal

17

quotation marks omitted) (imposing a 90-day suspension on an attorney who consistently failed to timely file and pay over employment taxes but was not criminally prosecuted), *amended by In re Moulton*, 733 N.W.2d 777 (Minn. 2007) (order).

We further agree with the referee's determination that Benson's misappropriation caused T.A. significant financial and emotional hardship. T.A. and M.A. had taken out a second mortgage on their home to pay Benson's initial fee and had to take out another loan to cover the additional $12,500 Benson requested for trial expenses. Benson's failure to timely repay T.A., coupled with her inability to work full-time, made it difficult for T.A. to keep current on the family's loan payments. In addition to these financial harms, we recognize that failure to refund unearned fees can cause "delay, anxiety, distress, and loss of faith in the legal system" for victims of misappropriation. *In re McCloud*, 26 N.W.3d 445, 454 (Minn. 2025) (citation omitted) (internal quotation marks omitted). Indeed, T.A. reasonably testified that she was shocked, disappointed, and "heartbroken" by Benson's conduct.

For similar reasons, we agree with the referee's finding that Benson's misconduct harmed the legal profession and "seriously damaged the reputation of the Minnesota Bar." We have held that "[m]isappropriation of client funds, by its very nature, harms … the legal profession[] and the administration of justice." *In re Bradley*, 7 N.W.3d 604, 609 (Minn. 2024) (citation omitted) (internal quotation marks omitted). Surely a prominent attorney's highly publicized conviction for felony tax crimes undermines the public's confidence in Minnesota's public defender system and its perception of lawyers

18

generally. Benson's harm to the public, T.A., and the legal profession weighs in favor of severe discipline.

B.

Next, we consider whether aggravating or mitigating circumstances bear on the appropriate discipline for Benson. *Matson*, 889 N.W.2d at 24–25. Here, the referee found four aggravating factors: Benson's history of prior discipline, his experience practicing law, the selfish motive behind his misconduct, and his lack of remorse. The referee also found Benson's professional contributions, including his public service and pro bono work, to be a mitigating factor, although not substantial enough to affect his ultimate recommendation to disbar. Before us, Benson challenges the referee's finding that he lacked genuine remorse for his misconduct and appears to argue that the referee did not give his professional contributions adequate weight as a mitigating factor. We review the referee's findings and conclusions related to aggravating and mitigating factors for clear error and discuss each factor in turn. *See In re Ulanowski*, 800 N.W.2d 785, 801 (Minn. 2011).

1.

First, the referee did not clearly err in finding that Benson's history of prior discipline is an aggravating factor. We consider a history of prior discipline to be an aggravating factor because we expect "a renewed commitment to comprehensive ethical and professional behavior" after disciplinary proceedings. *In re Nelson*, 733 N.W.2d 458, 464 (Minn. 2007) (citation omitted) (internal quotation marks omitted). Prior discipline for similar misconduct is especially concerning because "similarity of misconduct is

19

evidence of a lack of renewed commitment." *In re Klein*, 609 N.W.2d 230, 233 (Minn. 2000).

Benson received an admonition in 2015 for failing to deposit client funds into a trust account without an appropriate written fee agreement, failing to adequately communicate with a client, and improperly describing his fee as "earned upon receipt" in his fee agreement. In 2019, Benson received another admonition, again for failing to hold an advance fee in trust, failing to clearly communicate the basis of his fees to a client, and failing to timely return a client's file upon termination of the representation despite repeated requests. We agree with the Director that this carelessness with client funds and failure to adequately communicate, especially regarding fees, is similar to Benson's misconduct in the matter regarding T.A.'s funds, albeit less severe. Moreover, much of Benson's misconduct in the tax matter occurred after he received the first admonition. His misappropriation of T.A.'s funds occurred after both admonitions. Because Benson's misappropriation of T.A.'s funds and tax misconduct indicate that he did not renew his commitment to ethical behavior following his admonitions, the referee's conclusion that Benson's prior disciplinary history aggravates his current misconduct is not clearly erroneous.

2.

Second, the referee properly found Benson's substantial experience in the practice of law, and criminal defense specifically, to be an aggravating factor. *See In re Fett*, 790 N.W.2d 840, 851–52 (Minn. 2010) ("[W]e have also considered the attorney's experience in a particular area of the law to be an aggravating factor when the

20

misconduct arises from that area of practice."). At the time of his felony conviction, Benson had practiced law for more than 25 years and had represented several clients facing the exact same charges he faced in 2024. Benson also had nearly 20 years of experience operating a private criminal defense firm at the time he represented A.A. Thus, the record supports the referee's conclusion that Benson's significant experience in relevant areas of law aggravates his misconduct.

3.

Third, the referee's finding that Benson had a selfish motive in committing tax evasion and misappropriation is not clearly erroneous. We recognize selfish and pecuniary motives behind attorney misconduct as aggravating factors. *See, e.g.*, *In re Harrigan*, 841 N.W.2d 624, 630 (Minn. 2014) (noting that selfish motive was an aggravating factor when the attorney misused client funds for personal expenses). Although Benson initially maintained that he had no intention of keeping T.A.'s money, he no longer disputes that he intentionally used T.A.'s money for his own purposes. Benson's bank records show that he spent T.A.'s money on various personal expenses on the very same days that she sent payments to the firm's operating account. Benson's responses to T.A.'s communications regarding a refund also suggest that he paid his own expenses related to his criminal case rather than promptly returning T.A.'s money. Thus, the record supports the referee's finding that Benson's misconduct had a selfish motive because he converted T.A.'s money and the taxes he owed the IRS to "his own personal and business use." The referee's conclusion that Benson's misconduct resulted from a selfish motive, which constitutes an aggravating factor, was not clearly erroneous.

21

4.

Fourth, we consider the referee's finding that Benson lacked remorse for his misconduct. "A lack of recognition by an attorney of their misconduct—and a lack of remorse for such conduct—constitutes an aggravating factor." *In re Langree*, 9 N.W.3d 159, 171 (Minn. 2024). "To express remorse, an attorney must express genuine regret and moral anguish for his or her conduct and the effect it had on others." *In re Severson*, 860 N.W.2d 658, 670 (Minn. 2015). Here, the referee found Benson's limited expressions of regret at his evidentiary hearing insufficient to show genuine remorse, and also found that Benson demonstrated "a remarkable lack of insight into understanding the substantial harm he has caused." Benson argues these findings are clearly erroneous because the evidence establishes that he accepted responsibility for his misconduct and acknowledged wrongdoing throughout the sentencing hearing for his tax offense and in his testimony at the evidentiary hearing in this case. He further argues that he has adequately demonstrated remorse and that the referee should have instead considered this to be a *mitigating* factor.

The record supports the referee's findings that Benson lacked insight into the harm his misconduct caused and that he did not express genuine remorse. First, the record establishes that Benson did not appreciate his misconduct's effects on others or on the profession. Nothing in his testimony in this case or in the sentencing briefing in his criminal case demonstrates that Benson understands the effects of his failure to pay over $200,000 in taxes owed to the federal government, including the substantial public resources that were necessary to investigate and prosecute him for that failure. *See*

22

*Moulton*, 721 N.W.2d at 905 (observing that "the failure to pay employer's withholding taxes is tantamount to taking employees' money for the attorney's own use, breaches the trust established between employer and employee, and calls on governmental resources to enforce compliance with the law by those who are sworn to uphold it" (citation omitted) (internal quotation marks omitted)). And Benson demonstrated little appreciation for the harm his tax misconduct caused the public defender's office or the public's perception of the profession. Instead, Benson's testimony focused on the effects his misconduct would have on *him*—his criminal sentence, inevitable professional discipline, and loss of reputation among friends, colleagues, and family. For example, Benson demonstrated a lack of appreciation for the significance of his misconduct and the harm he had caused when he testified at the evidentiary hearing in this case that he took the chief public defender position despite the IRS's civil audit because he only expected the audit to result in "a bill." That is perplexing because Benson knew his failure to pay was a felony—he was an experienced criminal defense attorney who had represented at least five clients charged with the same crime. And contrary to Benson's suggestion that he resigned as chief to protect the public defender's office, he did not do so until several months after learning of the criminal investigation, and then only after news of the investigation became public. Considered together, Benson's actions do not indicate that he understood the consequences of his conduct, but instead that he thought he would suffer no consequences at all. Thus, the Director's characterization of Benson's understanding of the consequences as primarily "regret[ting] the consequences to himself" is a fair one.

23

Even before us, Benson quibbles with the referee's minor factual error regarding the timing of his resignation while completely missing the referee's broader point that the criminal case against Benson harmed the public defender's office regardless of the stage of the case when he resigned. Viewing the record as a whole, there is significant evidentiary support for the referee's finding that Benson did not appreciate the consequences of his tax misconduct.

Benson's conduct in the misappropriation matter tells a similar story. Benson knew or should have known that T.A. would have significant difficulty coming up with the additional $12,500 he requested for trial expenses because he knew that A.A. was initially represented by a public defender and that T.A. had expressed concerns with the cost of hiring a private defense attorney. Yet it did not occur to Benson to repay this money until the Director notified him of T.A.'s complaint.[6] Even after T.A. filed her complaint, Benson only partially reimbursed her, ignoring T.A.'s follow-up communications for nearly nine months. And he did not repay in full for more than two-and-a-half *years* after the initial misappropriation—all while T.A. was struggling to make ends meet. Benson's testimony that he could not timely repay T.A. due to financial difficulties brought on by

---

[6]    To the extent Benson argues that his eventual repayment to T.A. demonstrates remorse or that it should independently be considered a mitigating factor, we disagree. That argument is inconsistent with our cases holding that restitution to a misappropriation victim is not a mitigating factor if the attorney only makes restitution after receiving notice of a disciplinary complaint. *See, e.g.*, *In re Fairbairn*, 802 N.W.2d 734, 746 (Minn. 2011) (explaining that restitution is not a mitigating factor if it is "prompted by an attorney's fear of getting caught"). Here, it did not occur to Benson to reimburse T.A. until the Director notified him of T.A.'s complaint, and it took another year-and-a-half for him to fully repay her. These facts suggest that Benson's eventual restitution was not motivated by genuine remorse but rather was made to avoid more severe discipline.

24

the investigation and his eventual indictment confirms that Benson prioritized himself over his fiduciary obligations to his former client. Thus, the record supports the referee's finding that Benson did not fully appreciate the difficulties his misappropriation misconduct caused T.A. and her family.

Furthermore, the referee did not clearly err in finding that Benson's expressions of regret were not genuine. Indeed, Benson initially disputed that his failure to safeguard and return T.A.'s money was misappropriation at all. Only when the referee questioned him did Benson acknowledge that he misappropriated T.A.'s money. Even then, Benson insisted that his misappropriation "would fall in the negligent category." *But see Eskola*, 891 N.W.2d at 299 (finding intentional misappropriation when "funds belonging to a client are not deposited in a trust account and are used for any purpose other than that specified by the client" (citation omitted) (internal quotation marks omitted)). And while Benson conceded that he should have held the $7,500 he claimed was for a mitigation specialist in trust and returned the money following A.A.'s sentencing, he indicated that it was "debatable" whether he should have deposited the $5,000 for "trial expenses" into a trust account. *But see* Minn. R. Prof. Conduct 1.15(c)(5) (requiring a lawyer to "deposit all fees received in advance of the legal services being performed into a trust account and withdraw the fees *as earned*" (emphasis added)). Despite Benson's attempt to minimize this testimony, we agree with the referee that equivocal words like "debatable" do not "express genuine regret." *Severson*, 860 N.W.2d at 670.

Moreover, although Benson has apologized for putting T.A. and her family through "what they had to go through" and expressed that it was "unfortunate" that T.A.

25

thought less of him and of lawyers in general because of his wrongdoing, Benson continued to minimize and attempted to excuse his misconduct. For example, Benson suggested that he did not promptly return T.A.'s money, in part, because she never affirmatively asked him to. Similarly, Benson's sentencing briefing in his criminal tax case describes his failure to pay taxes as "falling behind"—a natural result of his need to make payroll for employees and serve clients in a firm that grew beyond his capacity to manage alone—as opposed to an intentional failure to meet known tax obligations. The referee did not clearly err in finding these explanations did not "genuinely" convey "regret and moral anguish." *Id.*

Relatedly, and most importantly, Benson does not address the referee's finding that, regardless of the substance of his testimony, his expressions of remorse were "insincere, contrived, and not credible." We give particular deference to a referee's findings related to an attorney's "credibility, demeanor, or sincerity" in disciplinary proceedings. *In re Wentzell*, 656 N.W.2d 402, 405 (Minn. 2003). Here, the referee had the opportunity to observe Benson's testimony in person and assess his tone and body language. He found the sincerity of Benson's limited apologies and expressions of remorse wanting, and we decline Benson's invitation to reweigh the evidence in light of this credibility determination.

For these reasons, the referee's conclusion that Benson's lack of remorse—further evidenced by his lack of appreciation for the harms he caused—aggravated his misconduct is not clearly erroneous.

5.

Benson further argues that the referee erred in failing to consider Benson's "good works" as a "substantial mitigating factor." Importantly, though, the referee here *did* find that Benson's professional contributions, including pro bono and public service work, were a mitigating factor. The referee ultimately concluded, however, that "[t]he aggravating factors tower in comparison to [this] mitigating factor[]" and that Benson's contributions were "overshadowed by his substantial ethical failures that occurred over many years and devast[at]ed many people." Thus, we consider whether the referee properly weighed this mitigating factor in making his ultimate recommendation for discipline.

We agree with the referee that contributions to the legal profession or significant pro bono work can be a mitigating factor when otherwise-severe discipline would be warranted. *See, e.g.*, *Rooney*, 709 N.W.2d at 271 (holding that the attorney's good character, pro bono legal work, and volunteer work helped mitigate presumptive disbarment for misappropriation to an 18-month suspension). We also agree with the referee that these contributions should be considered a mitigating factor in this case. The record contains many letters from Benson's friends, colleagues, mentors, and clients that speak powerfully to his good character, commitment to improving criminal defense representation, and positive contributions to the Hennepin County Public Defender's Office. These accounts of Benson's character and contributions to the profession undoubtedly weigh in favor of mitigation. Benson also presented evidence showing his commitment to vigorous criminal defense advocacy, improving diversity in the bar, and

27

mentoring younger trial lawyers. Indeed, he spent several years as a public defender and volunteered a substantial amount of time at a trial skills academy he helped found to train early-career public defenders.

Because we retain "ultimate responsibility for determining the appropriate sanction," *Nwaneri*, 896 N.W.2d at 525, we need not defer to a referee's recommendation for discipline and may weigh mitigating factors differently than the referee. Here, however, we agree with the referee that, generally, professional contributions and good works "do not militate against the imposition of discipline in matters of serious ethical misconduct." *Rooney*, 709 N.W.2d at 271 (citation omitted) (internal quotation marks omitted). Our determination of the appropriate discipline in light of any mitigating factors ultimately depends on the "unique facts and circumstances of each case." *Matson*, 889 N.W.2d at 25 (citation omitted) (internal quotation marks omitted). Here, other facts support the referee's conclusion that Benson's professional contributions should not be treated as a *substantial* mitigating factor.

First, most of Benson's letters of support were initially submitted to the federal court in connection with Benson's criminal sentencing. They speak primarily to why a prison sentence would not have been appropriate in his criminal case, and most do not consider Benson's misappropriation in the A.A. matter. Some even rely on the inevitability of Benson receiving serious professional discipline—including possible disbarment—as a reason for leniency at sentencing. We find these letters less helpful in assessing Benson's current fitness to practice law given the totality of his misconduct.

Second, pro bono work is not a mitigating factor if an attorney did no more pro bono or volunteer work than expected. *See In re Hanvik*, 609 N.W.2d 235, 239–40 (Minn. 2000). Here, Benson spent most of his career practicing private criminal defense. And although Benson testified that he often took contract work from public defenders' offices around the state, he does not quantify, and the record does not show, what portion of his services he provided at reduced or no cost.

Thus, we agree with the referee that the evidence of Benson's professional contributions does not sufficiently offset the seriousness of his misconduct considering the other aggravating factors present here.

C.

Having reviewed the "unique facts and circumstances" relevant to the mitigating factor the referee found, we now look to similar cases to decide whether this mitigating factor warrants a departure from the presumptive discipline of disbarment given the nature and cumulative weight of Benson's misconduct, the harms caused, and the aggravating factors discussed above. *Matson*, 889 N.W.2d at 25. For the following reasons, we conclude it does not.

To start, we reiterate that the presumptive discipline for either intentional misappropriation or tax misconduct resulting in a felony conviction, considered individually, is disbarment. *Bradley*, 7 N.W.3d at 608 (discussing misappropriation); *McNeilly*, 18 N.W.3d at 780 (discussing felony convictions). We do not, however, automatically disbar attorneys convicted of felonies. *In re Koss*, 572 N.W.2d 276, 277 (Minn. 1997). Instead, we "consider the circumstances surrounding the criminal act to

29

determine if some discipline, short of disbarment, is appropriate." *Id.* Similarly, we can "consider mitigating circumstances in cases involving intentional misappropriation of client funds and … in certain cases such mitigating factors may result in a sanction less severe than disbarment." *Rooney*, 709 N.W.2d at 270–71. However, "when the misconduct includes other ethical violations in addition to the misappropriation … mitigating factors usually will not militate against disbarment." *Id.* at 272.

The referee recommended that Benson be disbarred, concluding that "[o]n balance, the aggravating factors tower over and outweigh the mitigating factor." Although we generally give "great weight" to a referee's recommendation, we have the ultimate responsibility for determining the appropriate sanction based on the specific facts of each case. *In re Greenman*, 860 N.W.2d 368, 376 (Minn. 2015) (citation omitted) (internal quotation marks omitted). Here, however, we see little room in our case law to depart from the referee's recommendation.

Benson points us to a number of cases in which we imposed discipline short of disbarment for *either* intentional misappropriation *or* a felony conviction when significant mitigating circumstances existed. Benson cites *In re Sea*, 832 N.W.2d 851 (Minn. 2013) (order); *In re McCloud*, 826 N.W.2d 529 (Minn. 2013) (order); *In re Jones*, 763 N.W.2d 38 (Minn. 2009) (order); and *In re Butler*, 960 N.W.2d 540 (Minn. 2021), in arguing that we have routinely elected to suspend, rather than disbar, attorneys convicted of filing materially false income tax returns. He also cites *In re Klotz*, 909 N.W.2d 327, 340–41 (Minn. 2018); *Rooney*, 709 N.W.2d at 272–73; and *In re Fairbairn*, 802 N.W.2d 734, 747–48 (Minn. 2011), for the proposition that suspension may be warranted in

intentional misappropriation cases when substantial mitigating factors are present. In those cases, we imposed discipline ranging from an 18 month suspension to indefinite suspensions depending on the severity of the misconduct and the relative strength of the mitigating circumstances.

But critically, none of the attorneys in *Sea*, *McCloud*, *Jones*, or *Butler* intentionally misappropriated client funds *in addition to* committing felony tax offenses. Likewise, none of the attorneys who intentionally misappropriated funds in *Klotz*, *Rooney*, or *Fairbairn* were *also* convicted of felony tax fraud arising out of their law practice. Benson cites no case in which a lawyer who intentionally misappropriated client funds *and* committed a separate felony in the course of practicing law was suspended rather than disbarred, and we have found none.

Under the circumstances of this case, we conclude that a suspension would not adequately protect the public or the judicial system. For nearly a decade, Benson willfully and repeatedly put his own financial needs over his duties to the public and to his clients. This pattern of misconduct caused serious harm, the extent of which Benson still fails to fully grasp and for which he does not convincingly express remorse. Instead of demonstrating a renewed commitment to ethical practice following his earlier admonitions for similar misconduct, Benson engaged in more serious, sustained misconduct. We acknowledge that Benson has done much good for the public throughout his career. But, in Minnesota, the practice of law "is a privilege, not a right." *In re Swanson*, 405 N.W.2d 892, 893 (Minn. 1987). By his actions Benson has forfeited that privilege, and disbarment is the only appropriate sanction.

31

**CONCLUSION**

For the foregoing reasons, respondent Kassius O. Benson is disbarred from the practice of law in the State of Minnesota, effective on the date of this opinion. Respondent must comply with Rule 26, RLPR (requiring notice to clients, opposing counsel, and tribunals), and must pay $900 in costs under Rule 24(a), RLPR.

Disbarred.